LECHE, J.
Defendant appeals from a judgment placing it in the hands of a receiver.
The Destrehan Mercantile Company was organized as a corporation with its domicile *811 at Destrehan, in the parish of St. Charles, on August 6, 1919. The purpose of the corporation was to engage in the wholesale and retail mercantile business, and with that end in view, its capital stock was fixed at $50,000 with authority to do business when $25,000 of its stock would be subscribed and paid. Its affairs were to be managed by a board of directors composed of not more than seven nor less than three directors, the number to be determined and the directors to be elected annually by the stockholders on the second Tuesday in July or any subseguent day to be fixed by the board of directors in case of no election taking place on that day. The first board of directors consisted of three directors, Jules J. Eisher, president, Ohas. E. Smith, vice president, and Henry Hirsch, secretary-treasurer and general manager, owning, respectively, $5,000, $3,000, and $17,-000 of stock. Within a month or two, the corporation went into business by opening a general country store at Destrehan, and subsequently two other stores were opened, the dates not appearing in the record, at Good Hope or Sarpy and at St. Rose, all in the parish of St. Charles.
When the present application for the appointment of a receiver was filed, on September 8, 1921, J. H. Bruns was president of the corporation; plaintiff, Olus H. Shelton, was vice president; there was no secretary-treasurer, Robert H. Burton, who had held that position, having resigned April 19, 1921; there were, however, two other members on the board of directors, E. B. Rowan and Charles E. Smith. In this litigation, Olus H. Shelton has the co-operation of E. C. Drews, a stockholder, and the defense on behalf of the corporation is made by J. I-I. Bruns, its president, assisted by E. B. Rowan, director. The corporation was then under the control of a board composed of four directors, one of whbm is plaintiff, another who, although he is said to be the intimate friend and ally of plaintiff and is charged in argument with being the instigator of these proceedings, is apparently neutral so far as shown by the record, and two others who are actively defending this litigation for having been charged by plaintiff with assuming, without authority, the management of the affairs of the corporation, grossly mismanaging the same, committing acts ultra vires, wasting, misusing,, and misapplying the property and funds of said corporation. It is unfortunate, but only-human, that these charges and counter charges should have excited ill feeling between these directors and stockholders of theDestrehan Mercantile Company. If personal differences between the directors of a corporation and its stockholders were sufficient cause by themselves to wrest the control of its affairs from the corporation and vest it in-the hands of a receiver, we might stop here and proceed to enter a decree; but the statute only authorizes the appointment of a receiver to a corporation at the instance of a stockholder, when certain acts of gross mismanagement or waste, misuse, misapplication of property and funds are alleged and proved.. We assume that plaintiff acted upon appearances, and that he did so in good faith, and that the officers representing the defendant corporation, misconstruing the motives of plaintiff, resent his action as an attack upon their personal integrity. Plaintiff claims-that, in substantiation of his charges of mismanagement, he has proved:
[1] 1. That no meeting of the stockholders of the corporation has ever been called, since its incorporation.
Admitting this to be true, plaintiff must bear his share of the responsibility for this charge of nonfeasance. 1-Ie was a stockholder of the corporation, never attempted' to have such a- meeting called, and although the minutes of January 23, 1920, do not show that he was present at a meeting said to be-of the stockholders, he was upon that occasion elected vice president and J. H. Bruns and E. B. Rowan were elected directors,. *813 Bruns being also at the same time elected president. It is apparent from all the evidence that the stockholders of the corporation were few in number, were friendly, frequently met one another and the affairs of the corporation were managed in an informal manner. One of the witnesses aptly said that the business was conducted in the same manner as a partnership. We do not think that this amounts to an act of mismanagement on the part of the president of the corporation.
[2] 2. That there has been no meeting of the board of directors since January, 1921, ¡although plaintiff frequently requested one; his request being thrown in the waste paper basket.
The evidence shows that plaintiff had on some occasion discussed the advisability of calling a meeting of the board of directors, and that on July 14, 1921, he wrote a letter which he forwarded 'by registered mail to E. B. Rowan, requesting that a meeting of the board be called “with a view of arriving ¡at some means whereby myself, as well as a ■few other stockholders, m’ay be permitted to .dispose of their holdings in this company.”
Plaintiff in his testimony says that he attempted to have a meeting of the board of directors called, by verbal conversations, telephone conversations, and by letters. He does not say with whom these conversations were had, nor does he attempt to fix their dates. The only positive proof of a request on the part of plaintiff is the letter of July 14, 1921, and that letter was addressed to Rowan, a director with no greater authority than plaintiff. It is true that plaintiff resided at Destrehan, in St. Charles parish, and that Rowan lived in New Orleans and was in close touch with Bruns, president of the board, who also lived in New Orleans; that Bruns and Rowan made frequent trips to Destrehan to ascertain the condition of affairs in the Destrehan store; and that they seemed to have assumed the management of the business. These are the probable reasons for which plaintiff made his written request on Rowan instead of Bruns, who as president, would generally have the authority to call such a meeting. In order to understand the connection of ' Bruns and Rowan with the corporation, it is necessary to revert to the 23d day of January, 1920, when Rowan bought 20 additional shares, and Bruns bought 10 additional shares, of the capital stock. Henry I-Iirsch, who up to that time had been secretary-treasurer and general manager, re-, signed, and R. H. Burton was elected secretary-treasurer and became automatically, as admitted by plaintiff, manager of the business affairs of the corporation. Burton continued the management during the year 1920, and a financial statement of the business done from January 1, 1920, to November 30, 1920, showed sales amounting to some $149,000 and a net loss of over $11,000. A meeting of the board of directors was held on January 8, 1921, at which plaintiff was present, and the minutes show the following entry:
“A general discussion in regard to the affairs of the company followed, and it was the consensus of opinion that a general manager be employed to take charge of all three of the company’s stores. Mr. Rowan stated that he could possibly get in touch with a competent man in Chicago. He was requested to do this and endeavor to make a satisfactory arrangement, either with him or some other party, and report at the next meeting.”
The next meeting was never held, and on April 19, 1921, Burton resigned as secretary-treasurer and as director. Rowan testifies that he did get in communication with a man competent to manage the stores of the company, but he thought that $75 a week, the salary demanded, was entirely beyond the paying ability of the company. Plaintiff is recorded as being present at the meeting held January 8, 1921, and the presumption is that he was made cognizant of the financial statement showing the loss of $11,000 during the *815 year 1920. That loss is not shown to have resulted from the actions of Bruns and Rowan, but is supposed to have been due to many causes, most of which were beyond the control of Bruns and Rowan. It is suspected that some of the clerks in the stores were guilty of dishonesty, and it is shown that Burton at one time used over $400 of the company’s money, but this amount was after-wards reimbursed. Bruns and Rowan both testify that plaintiff and Smith, the other two directors, were made aware of this act of Burton, although plaintiff denies such knowledge.
It must have been evident to all the directors, at the meeting of January 8, 1921, that the affairs of the company were in very bad shape. Plaintiff attributes this condition t6 the mismanagement of Bruns and Rowan.
If there was mismanagement' — and the heavy loss seems to indicate that there was — • it was due, either to the incapacity, or to the lack of attention of Burton, for whose conduct it would be unfair to hold Bruns and Rowan responsible. We have no doubt that Bruns and Rowan acted in good faith when, at this critical period in the conduct of the corporation’s affairs, they tried to remedy -the situation by giving their personal attention to the conduct of the stores in St. Charles. They both lived in New Orleans; they were unable to secure the services of a competent store manager and to superintend from the city of New Orleans three country-stores, badly crippled in a financial way, was no easy task. Plaintiff, who lives at Destrehan was undoubtedly aware of the general condition of the business of the company, for he was then on friendly terms with. Bruns and Rowan and saw them frequently, as they visited Destrehan two or. three times a week. It would have been more in accord with good business methods to have had frequent meetings of the 'board of directors under such critical conditions, but the custom had grown, in the conduct of the company’s affairs, of transacting business in an informal way by personal consultation between the directors. Plaintiff wrote to Bruns for a statement of the financial condition of the business, but Bruns was not in a position to give such a statement before he could get an audit of the books. Plaintiff’s letter to Rowan, asking for a meeting of the board in order that he and other stockholders might be in a position to sell, giving, under the conditions of the charter, the preference to the corporation to make purchase thereof, was sent by registered mail. Rowan says that he was extremely busy when the letter was handed to him, and “it made him a little huffy to get such a letter by registered mail, that he knew Shelton real well and did not deserve to be considered 'by Shelton as that sort of a fellow who would not acknowledge the receipt of an ordinary letter,” and that he threw the letter in a waste paper basket.
Considering all the circumstances and the conditions under which the affairs of the corporation had been conducted, we do not believe that the failure of Bruns, president of the company, to call a meeting of the board, amounted to gross mismanagement.
[3] 3. That no secretary-treasurer and general manager has been selected, although the board of directors at its last meeting in January, 1921, declared “it was the consensus of opinion that a general manager be employed to take charge of the three stores of the company.”
This charge is true. But it sufficiently appears from the evidence that Rowan, who had been requested to employ a manager, diligently tried to get such a man, but was unsuccessful; that about the first of August, 1921, he did employ a man by the name of Richardson, who had been highly recommended; but that Richardson, in the language of Rowan, proved to he a “fizzle.” This certainly does not amount to gross mismanagement.
*817 [4] 4. That J. H. Bruns, president, and E. B. Rowan, members of the board of directors, have for some time past assumed the management of the business.
In truth and in point of fact, Bruns and Rowan did, after the meeting in January, 1921, devote a good deal of their personal attention to the conduct of the company’s stores, going from New Orleans to St. Charles two or three times a week for that purpose. They did not thereby usurp any authority; they did not conceal anything from plaintiff or from Smith, the other two directors, nor did they refuse to consult and advise with the latter. On the contrary, it appears that they would have welcomed the assistance of the two directors who resided at Destrehan, in their attempt to pull the business out of its financial difficulty. No complaint came to them from plaintiff, and their conduct seems to have been inspired by a desire to save the enterprise in which they were all very much interested. So anxious were they to do so that they indorsed a note of $10,000 in the Citizens’ Bank & Trust Company, for money loaned to the corporation. We do not believe that the actions of Bruns and Rowan, in this regard, amount to gross mismanagement.
5. That E. B. Rowan and J. H. Bruns are associated together under the name of Smith-Davis & Co., in a general grocery brokerage business in the city of New Orleans.
6. That a man named Armbruster, who was an employe of Smith-Davis & Co., was designated by Rowan and Bruns to sign the checks of the Destrehan Mercantile Company, as secretary-treasurer, although néver elected to that position by the board of directors.
7. That Smith-Davis & Co. made commission upon the sales of goods bought by them for account of the Destrehan Mercantile Company.
[5] These three statements are true. Bruns- and Rowan are members of the firm of Smith-Davis & Co. There is nothing to indicate that they are the only members of that firm, and we should judge from its name that there are several other members composing the firm. The Destrehan Mercantile Company did business with Smith-Davis & Co. before Brans and Rowan became directors in the Destrehan Mercantile Company, and these business relations were continued with Smith-Davis & Co. after Bruns and Rowan, members of that firm, became officers of the corporation. These business relations were never concealed from the board of directors of the Destrehan Mercantile Company, and while it is admitted that Smith-Davis & Co. made a profit or commission on the goods which they sold to the Destrehan Mercantile Company, it is also shown that the prices paid by the latter company were the same as were paid by jobbers in the city of New Orleans, and that they were lower than the prices charged by such jobbers to country merchants. It is, as a rule, contrary to ethics that the same persons should act as agents of two principals whose interests are opposed to one another; but here it appears that there was no conce*iment on the part of the common agents and that, on the contrary, the transactions carried on by the agents were for the mutual benefit of both principals. We do not believe' that, under these circumstances, the acts of the agents constituted gross mismanagement. It is also true that Armbruster was designated by Bruns and Rowan to sign checks on behalf of the Destrehan Mercantile Company, but such checks were also required to be signed by Bruns as president.
It had been a standing rule of the board of directors of the Destrehan Mercantile Company that all checks be signed by two officers or directors. Rowan had an office in New Orleans at some distance from that of the Destrehan Mercantile Company, where Bruns usually remained, and for convenience sake the signatures of Armbruster acting in *819 the capacity of an auditor or agent familiar with the business of the Destrehan Mercantile Company was substituted for that of Rowan. Armbruster was an employé of Smith-Davis & Co.; he was an experienced buyer, knew the amount of the bills incurred by hind in his purchases for the Destrehan Mercantile Company, and it is not charged that he misappropriated or misused any of the funds of that company.
We do not believe that this constitutes gross mismanagement.
[6] 8. That Smith-Davis & Co.’s bookkeeper is also bookkeeper for the Destrehan Mercantile Company.
In this there is nothing reprehensible, and no wrong was done.
[7] 9. That Smith-Davis & Co. and the Destrehan Mercantile Company swapped checks for convenience.
Bx-uns and Rowan finding that the checking account of the Destrehan Mercantile Company was almost exhausted, placed in bank the check of Smith-Davis & Co. to the credit of the Destrehan Mercantile Company, and within a few days the latter company refunded this amount. It is not shown that any wrong was thereby done to the Destrehan Mercantile Company.
10. That Armbruster, an employs of Smith-Davis & Co. was the purchasing agent, under salary, of the Destrehan Mercantile Company. It is not shown that this was wrong or that any harm resulted to the Destrehan Mercantile Company.
[8] 11. That a store was built by Rowan and Bruns at Sarpy and by them rented to the Destrehan Mercantile Company, at a monthly rental of $125, all without the consent'of the board of directors. The Destrehan Mercantile Company has no lease on the property.
It is shown that the building formerly used as a store at Sarpy was unfit for the purpose, that the goods were removed into a building constructed by Bruns and Rowan, and that the bookkeeper was told by Bruns to enter a charge of $125 per month for rent. It is also shown that this action of Bruns, the date of which does not appear in the record, was not reported to or approved by the board of directors. We cannot say from the record whether there has been any meeting of the board since the stock of goods has been removed into the new building at Sarpy, but it is shown that the Destrehan Mercantile Company has not yet paid any rent for the use of the building.
This is another transaction contrary to ethics, but there was no concealment, nor has any harm been done to the Destrehan Mercantile Company.
[9] Under the numbers 12, 13, and 14, plaintiff complains of the losses suffered by the Destrehan Mercantile Company, already commented upon under the number 2 in this opinion, the apparent insolvency of the corporation, and the fact that claims amounting to some $1,500 are held by attorneys for collection. These matters might be cause for a creditor to seek the appointment of a receiver, but under the receivership statute, Act 159 of 1898, they are not grounds upon which a stockholder, as in this case, may demand such appointment.
A review of all the testimony does not, in our opinion, establish the grounds of gross mismanagement, the commission of acts ultra vires, or wasting, misusing, or misapplying the property or funds of the corporation by its directors or other officers. There may have been dishonesty on the part of some of the clerks employed in the stores, there may have been incapacity or negligence on the part of the store managers, but no doubt 'there was also great depreciation in the value of merchandise during the years 1919, 1920, and 1921. While it does not appear in the evi *821 dence, the overhead expenses in the conduct of the business may also have been largely a contributing cause for the losses incurred by the company. But all of the apparent causes for such losses occurred before Bruns and Rowan were forced into the position of having to superintend the business of the ■company and at a time when plaintiff had as much authority as either Bruns or Rowan.
We frankly confess that it might be better for both stockholders and creditors that the receivership should be continued, but the law ■does not vest us with sufficient discretion to enter such an order. We are, under the ■statute, limited to ascertain whether the ■evidence justifies a finding under paragraph '2 of section 1 of the act, to the effect that the directors or other officers are jeopardizing the rights of stockholders by gross mismanagement, etc. We do not think that the evidence justifies such a finding, and for that reason.
It is ordered that the judgment appealed from be avoided and reversed, and that plaintiffs’ demand be rejected, with costs.
’ Rehearing refused by Division B, composed of Justices O’NIELL; LAND, and BAKER.